IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


| | | |
|---|---|---|
| GRADY ALLEN PRICHARD | ) | |
| | ) | |
| v. | ) | NO. 2:08-0055 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform a significant range of light work during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), that the plaintiff's motion for judgment on the

1

administrative record (Docket Entry No. 17) should be denied, and that the defendant's motion for judgment on the administrative record (Docket Entry No. 21) be granted.

## I. INTRODUCTION

The plaintiff filed an application for DIB on September 3, 2002, with a protective filing date of August 21, 2002 (tr. 68-71), alleging a disability onset date of October 10, 2000, due to knee and shoulder injuries. (Tr. 69, 79.) His applications were denied initially and upon reconsideration. (Tr. 46, 48.) A hearing before Administrative Law Judge ("ALJ") Peter Edison was held on July 3, 2003. (Tr. 651-71.) The ALJ delivered an unfavorable decision on October 3, 2003 (tr. 327-40), and the plaintiff sought review of that decision by the Appeals Council. (Tr. 373-74.) On November 8, 2005, the Appeals Council remanded the case[1] (tr. 375-79) and a second hearing was held before ALJ James A. Sparks on April 5, 2005. (Tr. 672-88.) In the interim, the plaintiff filed another application for DIB with a protective filing date of November 21, 2003 (tr. 384-88), which ALJ Sparks associated with the remanded decision.[2] (Tr. 19.) The ALJ delivered an unfavorable decision on October 16,

---

[1] *See* 26-27 *infra* for the specifics of the remand order.

[2] The ALJ indicated that the plaintiff filed an application for DIB benefits on December 5, 2003, and an application for SSI on November 21, 2003, but it appears that there was only one application filed with a protective filing date of November 21, 2003. It is unclear from the record if the plaintiff filed an application for SSI benefits at all, and the plaintiff refers to his having filed only one claim for benefits on November 21, 2003. Docket Entry No. 18, at 2.

2006 (tr. 17-26 ), and the plaintiff sought review of that decision by the Appeals Council.

(Tr. 14-16.) On April 11, 2008, the Appeals Council denied the plaintiff's request for review

(tr. 9-11), and the ALJ's decision became the final decision of the Commissioner.

## II.  BACKGROUND

The plaintiff was born on December 19, 1963, and was thirty-six  years old as of

October 10, 2000, his alleged onset date. (Tr. 69.)  The plaintiff had completed ninth grade

(tr. 107) and had worked as a painting supervisor, greens keeper, insulation plant factory

worker, and sheet metal factory brake press operator. (Tr. 80, 93-97.)

### A. Chronological Background: Procedural Developments and Medical Records[3]

The plaintiff presented to Dr. William H. Sherwood, a family practitioner, in

February and April of 2000, with complaints of coughing and body aches, and

Dr. Sherwood diagnosed him with bronchitis, prescribed a Z-Pak[4] and Albuterol,[5] and

advised him to quit smoking. (Tr. 294-95.)   In 2000, Dr. Sherwood also prescribed

_____

[3] Every attempt to decipher the medical evidence of record was undertaken; however, some handwritten notations or poor copies made some of the records illegible.

[4] Z-Pak, also known as Zithromax, is an antibiotic. Saunders Pharmaceutical Word Book 778 (2009) ("Saunders").

[5] Albuterol is an inhaler used in treatment or prevention of bronchospasm. Physicians Desk Reference 3393 (64th ed. 2010) ("PDR").

Combivent[6] to the plaintiff to treat his emphysema (tr. 121) and the plaintiff continued

taking it until February of 2004. (Tr. 202, 278, 302, 495.)

On May 25, 2000, the plaintiff fell off a ladder and was admitted to Baptist DeKalb

Hospital. (Tr 167-69.) X-rays revealed that he had fractured his sixth and seventh right ribs

and he was prescribed Vioxx[7] and Vicodin.[8] (Tr. 171-73.)  On May 29, 2000, Dr. Sherwood

diagnosed the plaintiff with pneumonia and rib fractures and advised him not to return to

work until June 5, 2000. (Tr. 293.)  From June through August of 2000, Dr. Sherwood

examined the plaintiff on multiple occasions, diagnosed him with pain in his right upper

back and chest wall and a torn meniscus, prescribed Skelaxin[9] and Indocin,[10] and referred

him to Dr. Francisca V. G. Lytle, an orthopedic surgeon. (Tr. 287-90.)

On September 6, 2000, Dr. Lytle examined the plaintiff; diagnosed him with right

shoulder instability, a "[t]orn posterior horn of medial meniscus," and bilateral anterior

---

[6] Combivent is used to treat COPD. Saunders at 178.

[7] Vioxx was withdrawn from the market in 2004, but was a nonsteroidal anti-inflammatory drug ("NSAID") used to treat various forms of arthritis. Saunders at 756.

[8] Vicodin is used to relieve moderate to moderately severe pain. PDR at 560.

[9] Skelaxin is used to relieve "discomforts associated with acute, painful musculoskeletal conditions." PDR at 1848.

[10] Indocin is used in relieving pain associated with arthritis and acute shoulder pain related to bursitis and/or tendinitis. PDR at 2168.

knee pain; prescribed Celebrex;[11] and recommended physical therapy for his knee. (Tr. 216.) On September 16, 2000, an MRI of the plaintiff's left knee showed "[t]ears of the posterior aspect of both menisci" but an MRI of his right shoulder revealed "no definite abnormalities." (Tr. 164-65.) On October 10, 2000, Dr. J.W. Thomas Byrd, an orthopedic surgeon, performed arthroscopic surgery on the plaintiff's left knee to repair the meniscal tears. (Tr. 229.)

On October 31, 2000, Dr. W. Garrison Strickland, a neurologist, examined the plaintiff, diagnosed him with a nerve injury to his right deltoid that "most likely" dated back to a motor vehicle accident in 1990, and recommended that he undergo an MRI of his cervical spine and right brachial plexus. (Tr. 219-20.) A November 8, 2000, MRI of the plaintiff's cervical spine and brachial plexus showed "[m]inimal to mild degenerative changes without significant neural impingements" in his spinal cord and "[n]o brachial plexus abnormalities." (Tr. 218.) A handwritten note on this MRI report indicated that "tests showed injury to the nerve of the [right] arm which is located outside the spinal column [but] the nerves coming out of the spine look ok." *Id*.

In 2001, Dr. Sherwood prescribed Luvox[12] (tr. 285) and Prozac to treat the plaintiff's depression (tr. 121), and the plaintiff continued taking Prozac through December of 2004.

---

[11] Celebrex is used for the treatment of acute pain and arthritis. PDR at 3272.

[12] Luvox is used to treat obsessive-compulsive disorder ("OCD"). Saunders at 420.

(Tr. 202, 495, 529, 531.)  On January 25, 2001, Dr. Byrd examined the plaintiff, opined that his left knee was "fine," and referred him to Dr. Jim Clement, a physician in Louisville, Kentucky, for further evaluation of his right shoulder.[12] (Tr. 228.)  On March 9, 2001, Dr. Warren C. Breidenbach of Kleinert, Kutz, and Associates Hand Care Center in Louisville examined the plaintiff and diagnosed him with a brachial plexus injury in his right upper extremity. (Tr. 235.)  On March 18, 2001, the plaintiff presented to the Baptist Dekalb Hospital Emergency Room, complaining of left rib pain and he was prescribed Toradol,[13] but a chest exam revealed no abnormalities. (Tr. 149-50, 153.) On March 23, 2001, Dr. Breidenbach recommended that the plaintiff start physical therapy for his right shoulder and right upper arm muscles, and he noted that the plaintiff was only capable of "one-handed work." (Tr. 234.)

On March 29, 2001, the plaintiff presented to Dr. Wendell V. McAbee after coughing up blood, and he opined that the plaintiff's chest was normal but that there was evidence of "emphysema with bronchiectasis in the bases." (Tr. 145, 147.)  At this time, the plaintiff

_____

[12] There is no documentation in the record indicating that the plaintiff ever saw Dr. Clement.

[13] Toradol (ketorolac tromethamine) is a NSAID used to manage moderately severe acute pain. Saunders at 713.

was taking Toradol, Methocarbamol,[14] Prevacid,[15] and Luvox (tr. 284), and the plaintiff continued taking Prevacid through April 2003. (Tr. 202, 278, 302, 531.) On April 2, 2001, Dr. Sherwood ordered a bone scan that revealed "healing fractures of the right upper ribs" and degenerative changes in his left knee and he prescribed Celebrex. (Tr. 136-38, 283.) On that same day, a laboratory report from Quest Diagnostics indicated that the plaintiff likely had Wegener's Granulomatosis.[16] (Tr. 213.)

On April 19, 2001, Dr. Byrd completed an evaluation and found that the plaintiff's "left knee was settling down" and that he could return to work. (Tr. 224-25.) Dr. Byrd opined that in a normal day the plaintiff could stand/walk for six to ten hours and sit or drive for five to ten hours. (Tr. 225.)

On May 18, 2001, the plaintiff presented to Dr. Michael J. Moskal at the Shoulder & Elbow Center in Indiana for right shoulder discomfort. (Tr. 246.) He diagnosed the plaintiff with rotator cuff syndrome, "[p]osterior capsular contracture," "[b]ranchial plexus palsy," and right shoulder pain. (Tr. 246.) On June 6, 2001, Dr. Moskal performed a right shoulder

---

[14] Methocarbamol is a skeletal muscle relaxant. Saunders at 444.

[15] Prevacid is used to treat ulcers, erosive esophagitis, gastroesophageal reflux disease ("GERD"), and other gastroesophageal disorders. Saunders at 578.

[16] Wegener's Granulomatosis is a rare, "multisystem disease chiefly affecting males" that is characterized by inflammation of blood cells that can affect many organs but primarily involves the upper and lower respiratory tracts. Dorland's Illustrated Medical Dictionary 797 (30th ed. 2003) ("Dorland's").

arthroscopic release on the plaintiff to repair his rotator cuff. (Tr. 130, 244.) On July 12, 2001, Dr. Moskal completed a patient disability form stating that the plaintiff should not work from June 6, 2001, to June 20, 2001, and that he should not use his right arm from June 21, 2001, until his next office visit scheduled for November 2001. (Tr. 240.)

In September of 2001, Dr. Sherwood examined the plaintiff and diagnosed him with acute sinusitis, Chronic Obstructive Pulmonary Disease ("COPD"), and pneumonia. (Tr. 280.) On September 26, 2001, Dr. Moskal noted the atrophy of the plaintiff's right deltoid and his continued pain, and opined that he could begin "alternative activities" but should permanently avoid lifting his right arm repeatedly above shoulder level. (Tr. 237-38.) In October and November of 2001, Dr. Sherwood diagnosed the plaintiff with neuropathic pain in his right arm, recurrent rib pain, and right arm brachial plexopathy,[17] and prescribed Neurontin[18] and Voltaren.[19] (Tr. 206-07, 279.)

On November 3, 2001, Dr. Daniel R. Lalonde, Jr., a neurologist, performed a Nerve Conduction Study and needle electromyography (EMG) (tr. 207-08) and suspected that the plaintiff had "suffered a right brachial plexopathy involving the posterior cord." (Tr. 208.)

---

[17] Brachial plexopathy is pain and decreased range of motion and feeling in the arm and shoulder due to a nerve problem. Dorland's at 1452-53.

[18] Neurontin is used as "treatment for postherpetic neuralgia," a condition affecting nerve fibers and skin. Saunders at 488.

[19] Voltaren is an NSAID used to treat osteoarthritis. Saunders at 761.

On November 11, 2001, Dr. Sherwood examined the plaintiff, diagnosed him with a right brachial plexopathy, and prescribed Lortab.[20] (Tr. 205.) On November 12, 2001,[21] Carlton G. Wood, Ph.D., a clinical psychologist, conducted a Disability Assessment and found that the plaintiff had moderate, recurrent major depression; obsessive compulsive disorder ("OCD"); social phobia; alcohol dependency in remission; a personality disorder, not otherwise specified ("NOS"), with "obsessive compulsive and avoidant features;" and chronic neck, shoulder, and arm pain from a rotator cuff injury. (Tr. 266-67.) Dr. Wood assigned the plaintiff a GAF score of 58[22] and opined that his depression stemmed from his chronic pain and inability to work, contributed to his obsessive behaviors, and exacerbated his inability to concentrate. (Tr. 267.)

---

[20] Lortab is a pain reliever with the generic name of hydrocodone. Saunders at 415.

[21] The Disability Assessment is dated November 29, 2001, but the first line of the report indicates that the plaintiff was actually examined on November 12, 2001. (Tr. 266.)

[22] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. A score in the range from 51-60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* at 32, 34 (4th ed. 2000) ("DSM-IV-TR").

In December of 2001, the plaintiff was prescribed Soma,[23] Klonopin,[24] and Zantac.[25] (Tr. 264.) Between December of 2001, and January of 2002, the plaintiff received several epidural steroid injections for neck, shoulder, and right arm pain at the Pain Care Center (tr. 271, 273, 275), and from January of 2002, to October of 2005, the plaintiff continued receiving steroid injections to ease his right shoulder pain. (Tr. 196-201, 302, 518-19, 521, 523, 615, 617-18, 622, 624.)

On January 30, 2002, Dr. Sherwood examined the plaintiff and diagnosed him with neuropathic pain, brachial plexopathy thoracic nerve distribution, rotator cuff pathology, and depression. (Tr. 202.) A February 2, 2002, MRI of the plaintiff's thoracic spine revealed a "[s]mall to moderate size disc bulge at T9/10 eccentric to the left." (Tr. 128.) From February to September of 2002, Dr. Sherwood examined the plaintiff on several occasions, diagnosed him with brachial plexopathy, trigger pain in his right scapula, depression, and OCD, and prescribed Tegretol,[26] Darvocet,[27] a Lidoderm patch,[28] and Lortab. (Tr. 198-203.)

---

[23] Soma is a skeletal muscle relaxant. Saunders at 653.

[24] Klonopin is used for panic disorders and seizures disorders. PDR at 2855.

[25] Zantac is used for the treatment of ulcers, GERD, and erosive esophagitis. PDR at 1739.

[26] Tegretol is used as an analgesic for postherpetic neuralgia. Saunders at 688.

[27] Darvocet is a narcotic pain-reliever and fever-reducer. Saunders at 202.

[28] Lidoderm is used to relieve pain related to post-herpetic neuralgia, a condition that affects nerve fibers and skin. PDR at 1107.

In September of 2002, Dr. Sherwood noted that Tegretol was not helping the plaintiff and he ordered a decrease in its dosage. (Tr. 199.)  On June 1, 2002, the plaintiff went to the emergency room at Baptist DeKalb Hospital  due to pain and swelling in his left forearm after he mowed his yard and he was prescribed. Naprosyn.[29] (Tr. 122-24.)

On October 9, 2002, Dr. Melvin L. Blevins, a Disability Determination Services ("DDS") physician, conducted a consultative examination (tr. 182-91) and found that the plaintiff had respiratory problems including emphysema in the left lung and dyspnea,[30] paresthesia,[31] right shoulder brachial plexus, upper right arm pain that radiated into the right scapula (tr. 182-83), chronic bronchitis, right upper extremity weakness, left knee cartilage damage, GERD, and osteoarthritis. (Tr. 187.)  An x-ray of his right shoulder was "abnormal" and revealed evidence of a previous rotator cuff injury. (Tr. 190.)  Dr. Blevins opined that the plaintiff could occasionally lift less than twenty pounds, could not lift any amount of weight "frequently," could stand for four hours per day, and could sit for six hours per day. (Tr. 187.)

---

[29] Naprosyn, also known as Naproxen, is used for the relief of various forms of arthritis, tendonitis, bursitis, gout, and pain management. PDR at 2851.

[30] Dyspnea is difficulty breathing. Dorland's at 578.

[31] Paresthesia is "an abnormal sensation, as burning, prickling . . . etc." Dorland's at 1232.

On November 18, 2002, Dr. Reeta Misra, a non-examining DDS physician, completed a residual functional capacity assessment ("RFC") (tr. 174-81) and opined that the plaintiff could occasionally lift/carry fifty pounds and frequently lift/carry twenty-five pounds, stand, walk, and sit for six hours in an eight-hour workday, and push/pull an unlimited amount. (Tr. 175.)  Dr. Misra noted that the plaintiff is frequently limited in his ability to climb, balance, stoop, kneel, crouch, and crawl, and is limited in his ability to reach in all directions. (Tr. 176-77.)

On February 11, 2003, Dr. Sherwood tested the plaintiff's range of motion and found that he had decreased levels of abduction and forward elevation in his right shoulder. (Tr. 193.) On March 28, 2003, physical therapist Cindy Biankowski conducted a Functional Capacity Evaluation ("FCE") and she noted that "[t]he results indicate that [the plaintiff] gave somewhat inconsistent or sub-maximal efforts," noting that changes in his heart rate were not consistent with his complaints of pain. (Tr. 312.)  She related that the plaintiff's heart rate "changed very little or not at all with most tests, however [he] would request to stop due to pain." *Id.*  Ms. Biankowski found that the plaintiff had a brachial plexus injury, left knee injury, and decreased strength levels in his right upper extremity and decreased range of motion in his right shoulder, but noted that, otherwise, his range of motion was within functional limits. (Tr. 312-13.)  She opined that "[b]ased on [the plaintiff's] efforts

as they were demonstrated, he is unable to work at the Sedentary physical demand level . . . ." (Tr. 312.)

In April and June of 2003, the plaintiff presented to Dr. Sherwood with complaints of right shoulder pain and Dr. Sherwood diagnosed him with right scapula trigger pain and left knee pain, and prescribed Vioxx, Celebrex, and Tramadol.[32]  (Tr. 121, 302-03.) Dr. Sherwood also noted that the plaintiff's right upper extremity had a "disability," decreased range of motion, weakness, persistent pain, and muscle atrophy, and that these diagnoses were supported by "x-ray (MRI) studies and EMG studies." (Tr. 300-01.)

On July 1, 2003, Dr. Wood completed a mental Medical Assessment of Ability to Do Work-Related Activities ("Medical Assessment") (tr. 307-10) and noted that the plaintiff's ability to follow simple job instructions was "[v]ery [g]ood" (tr. 308); that his ability to follow work rules, use judgment, interact with supervisors, deal with work stresses, function independently, carry out complex and detailed work instructions, maintain personal appearance, behave in an emotionally stable manner, and demonstrate reliability was "[g]ood" (tr. 307-09); and that his ability to relate to co-workers, deal with the public, maintain attention and concentration, and relate predictably in social situations was "[f]air." (Tr. 307, 309.)  Dr. Wood diagnosed the plaintiff with mild, recurrent depression; OCD; social phobia; personality disorder, NOS (not otherwise specified), with obsessive

---

[32] Tramadol is used to manage moderate to moderately severe chronic pain. PDR at 2814.

compulsive and avoidant features; chronic neck, shoulder, arm, rib, and knee pain; and emphysema, and he assigned him a GAF score of 65.[33] (Tr. 307-08.)

Between July of 2003, and January of 2004, Dr. Sherwood examined the plaintiff on several occasions, diagnosed him with acute bronchitis, right scapula trigger pain, OCD, and COPD, and prescribed Levaquin[34] and Prednisone. (Tr. 520-24.)

On January 17, 2004, Dr. Walter W. Wheelhouse, an orthopedic surgeon, evaluated the plaintiff (tr. 500-10) and found that he had a full range of motion in his left knee, muscle atrophy in his right deltoid, weakness in his right shoulder and upper extremity (tr. 504), decreased strength in his right biceps, triceps, and hand, and that he was unable to kneel, squat, or perform a deep knee bend. (Tr. 505.) Dr. Wheelhouse diagnosed the plaintiff with right shoulder brachial plexus injury, a left knee torn median meniscus, five right rib fractures, and COPD with emphysema. (Tr. 508.) He opined that the plaintiff was unable to stand or walk for more than one hour at a time due to his left knee condition, was "unable to perform reaching activities," "excessive lifting activities," or "any type of pulling activity" with his right upper extremity (tr. 509), and his "activities of daily living are impaired." (Tr. 510) Finally, although Dr. Wheelhouse related that the plaintiff's

---

[33] A GAF score between 61-70 shows "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

[34] Levaquin is used to treat or prevent infections caused by susceptible bacteria. PDR at 2630.

overall prognosis was "poor," since he is a "right hand dominant individual" and has a "brachial plexus injury to his right upper extremity" (tr. 509), Dr. Wheelhouse "[did] not see any need for continued medical treatment as far as physical therapy or surgery for his right shoulder or left knee." (Tr. 510.)

On February 4, 2004, Dr. Roy Johnson, a consultative DDS physician, examined the plaintiff and noted that he had emphysema and shortness of breath, arthritis, headaches, numbness, tingling, atrophy of the right deltoid, and left knee tenderness but a full range of motion in his right shoulder. (Tr. 495-97.)  An x-ray of the plaintiff's right shoulder revealed degenerative cysts around the glenoid, but the x-ray was "otherwise negative."(Tr. 499.)  Dr. Johnson concluded that the plaintiff should avoid using his right upper extremity to perform overhead work and should not lift more than fifteen pounds frequently, but that his ability to sit/stand was not restricted and that "his work activity should not exceed any restrictions placed on him by his treating physician." (Tr. 497-98.) On May 10, 2004, Dr. Suzanne M. Fletcher, a non-examining DDS physician, completed a physical RFC assessment (tr. 511-16) and opined that the plaintiff could lift/carry twenty pounds occasionally and ten pounds frequently and could stand/walk/sit for about six hours in an eight-hour workday. (Tr. 512.)  She found that his ability to push/pull objects was not limited but that he could not reach in all directions, including overhead. (Tr. 512-13.)

Between September and October of 2004, Dr. Sherwood examined the plaintiff on several occasions, diagnosed him with left knee arthritis, right scapula trigger point pain, and left shoulder tendinitis, and referred him to an orthopedist for his chronic left knee pain. (Tr. 624-26.)  Additionally, between September 10, 2004, and October 8, 2004, the plaintiff had 11 physical therapy sessions at Baptist DeKalb Hospital for his left shoulder tendinitis. (Tr. 562-73.)  The plaintiff's discharge summary indicated that his goals were "achieved" (tr. 570) and that he made "nice progress with strengthening [his] left shoulder." (Tr. 562.)

On October 15, 2004, an MRI of the plaintiff's left knee revealed both mild and moderate osteoarthritis and thinning of the patella cartilage. (Tr. 575.)  On November 16, 2004, Dr. Anthony P. Dalton, an orthopaedic surgeon, performed arthroscopic surgery on the plaintiff's left knee to repair his medial and lateral menisci (tr. 579), and after surgery he prescribed Lortab. (Tr. 584.)  From December 1, 2004, to December 28, 2004, the plaintiff attended multiple physical therapy sessions for his left knee (tr. 585-94) and at discharge he had met all goals, including decreasing swelling; increasing joint stability, range of motion, strength, and functional abilities; establishing a home program; and reducing pain and tenderness, although his pain was still a four out of ten. (Tr. 586.)

On December 15, 2004, Stephen Hardison, M.A., a DDS psychological evaluator, examined the plaintiff (tr. 530-35) and noted that he could ambulate independently but

walked with a limp and was taking Etodolac,[35] Combivent, Prozac, Protonix,[36] Strattera,[37] and Lisinopril.[38] (Tr. 530-31.) The plaintiff reported having suicidal ideations in the past, that he has difficulty concentrating, that medication controls his OCD, that he does not cook or perform chores, that he is able to drive both a boat and an automobile, that he attends GED classes and church, and that he occasionally goes to the grocery store with his father. (Tr. 531-33.) Mr. Hardison diagnosed the plaintiff with attention deficit/hyperactivity disorder (ADHD) NOS, anxiety disorder NOS, and alcohol dependence in "full sustained remission." (Tr. 533.) Mr. Hardison opined that the plaintiff's ability to carry out simple instructions, to travel independently, to respond appropriately to changes in a work setting, to set realistic goals, and to make plans independently is not significantly limited; that his ability to sustain concentration and persistence in low stress environments and to interact socially is mildly limited; and that his ability to function in a chaotic environment is moderately limited. (Tr. 534.) He also

---

[35] Etodolac is used to treat osteoarthritis, rheumatoid arthritis, and other chronic pain. Saunders at 276.

[36] Protonix is used to treat GERD. PDR at 3573.

[37] Strattera is used to treat ADHD. PDR at 1958.

[38] Lisinopril is used to treat hypertension, heart failure, and acute myocardial infarction. PDR at 2242.

related that the plaintiff "likely" functions "in the low average range intellectually" and "would be limited to rather stressful routine job tasks in a low-stress environment." *Id.*

On December 21, 2004, Dr. John Fields, a consultative DDS examiner, completed a physical RFC (tr. 536-43) and found that the plaintiff could occasionally lift/carry twenty pounds and frequently lift/carry ten pounds, stand/walk/sit for about six hours in an eight-hour workday, and push or pull unlimited amounts. (Tr. 537.) Dr. Fields noted that the plaintiff's ability to reach overhead was limited (tr. 539) and he assigned the plaintiff a "light" RFC "based on some restrictions [with his right] arm and alleged pain." (Tr. 543.)

On December 30, 2004, Dr. Frank D. Kupstas, Ph.D., a non-examining consultative DDS evaluator, completed a Psychiatric Review Technique Form ("PRTF") (tr. 544-61) and listed the plaintiff's diagnoses as ADHD and anxiety disorder, NOS. (Tr. 549.) Dr. Kupstas determined that the plaintiff's mental disorders mildly restricted his activities of daily living and ability to maintain social functioning and moderately restricted his ability to maintain attention and concentration for extended periods of time, and he noted that the plaintiff displayed no episodes of decompensation. (Tr. 554.) Dr. Kupstas also completed a mental RFC and found that the plaintiff was moderately limited in his ability "to maintain attention and concentration for extended periods" and that he would have some difficulty with detailed tasks but would still be able to complete them. (Tr. 558, 560.)

From December of 2004, to October of 2005, the plaintiff presented to Dr. Sherwood on several occasions with complaints of right shoulder pain and sinus problems. (Tr. 615-22.) Dr. Sherwood diagnosed the plaintiff with sinusitis (tr. 619, 622) and right shoulder pain (tr. 615-18, 620-22), prescribed Augmentin[39] (tr. 622), and referred him for an MRI of his left shoulder. (Tr. 620.) A January 28, 2005, MRI of the plaintiff's left shoulder was "normal." (Tr. 628.)

Between February of 2005, and July of 2005, the plaintiff met with Dennis A. Weeks, from Cumberland Counseling Services, on several occasions.[40] (Tr. 643-50.) At intake, Mr. Weeks determined that the plaintiff did not have problems with his orientation, that his memory was intact, and that his affect, speech, attention/concentration, "thought content," and "impulse control" were all "normal." (Tr. 649-50.) He diagnosed the plaintiff with adjustment disorder with depressed mood, multiple orthopedic problems, and chronic pain, and assigned the plaintiff a GAF score of 60. (Tr. 650.)

The plaintiff presented to Dr. Dalton on February 24, 2005, with complaints of left shoulder pain and he diagnosed the plaintiff with "[p]robable rotator cuff tendinosis." (Tr. 614.) Dr. Dalton prescribed Darvocet and ordered an MRI of the plaintiff's left

_____

[39] Augmentin is used to treat sinusitis and other types of infections. PDR at 1332.

[40] This Court made every attempt to decipher Mr. Weeks' counseling session records; however, many of his handwritten notations were illegible. *See* tr. 643-49.

shoulder.[39] *Id.* In February, March, and April of 2005, the plaintiff received monthly steroid injections (tr. 612-14) and was prescribed OxyContin.[40] (Tr. 612.) In May of 2005, the plaintiff presented to Dr. Dalton and reported that the OxyContin had made him sick and he refused additional steroid injections in his left shoulder. (Tr. 611.) Dr. Dalton diagnosed him with severe bicipital tendinitis and mild impingement syndrome of the left shoulder and congenital hip dysplasia. (Tr. 610.) Dr. Dalton also found that the plaintiff's knee and hip symptoms were "mild-to-moderate" and should be addressed "expectantly in the future." *Id.* On June 7, 2005, Dr. Dalton performed arthroscopic surgery and biceps tenodesis on the plaintiff's left shoulder and biceps (tr. 595-97), and at two follow-up appointments, the plaintiff's shoulder movement had improved, his level of pain had decreased, and he was prescribed Avinza.[41] (Tr. 606-07.)

**B. Hearing Testimony from July 3, 2003: The Plaintiff and a Vocational Expert**

The plaintiff's first hearing in this case was held on July 3, 2003, before ALJ Peter Edison. (Tr. 651-71. The plaintiff was represented by counsel, and the plaintiff and Dr. Gordon Doss, a Vocational Expert ("VE"), testified. The plaintiff testified that he

---

[39] The results of the MRI do not appear to be in the record.

[40] OxyContin is used to manage moderate to severe pain. PDR at 2809.

[41] Avinza is morphine used to relieve continuous, moderate to severe pain. PDR at 1823.

completed the ninth grade, that he was studying for his GED, and that his last long term job was as a brake press operator at an appliance plant. (Tr. 654-55, 664.)

The plaintiff testified that he injured his right shoulder in a motor vehicle accident in 1990, but that he did not have shoulder surgery until June 2001, and that surgery did not relieve his pain. (Tr. 658.) He described his pain as "constant pain that runs down [his] neck down [his] shoulder blade and down [his] arm to [his] knuckles" with bruising and numbness. *Id.* The plaintiff related that he is right-handed, is only able to raise his right arm "halfway," and has lost most of his grip strength. (Tr. 658-59.) The plaintiff testified that he will also need surgery to repair his right deltoid muscle, that he has arthritic pain in his left shoulder, and that to alleviate the pain he has to lie down, change the position of his arm, or put a pillow under his arm since his medication does not "completely" alleviate the pain. (Tr. 659-60.)

The plaintiff related that he tore cartilage in his left knee after falling off a ladder and that, even after surgery, his knee pain persists. (Tr. 660-62.) He related that he only gets pain relief from elevating his leg and that his knee pain interferes with his ability to walk and stand. (Tr. 661.) The plaintiff also testified that he has a past rib injury that causes discomfort, has emphysema and is sensitive to dust, fumes, heat, and cold, and has been treated for depression but was feeling more stable at the time of the hearing. (Tr. 661-63.)

The plaintiff related that he is able to drive as long as he has a pillow behind him for support, occasionally goes to the grocery store, attends church and weekly Alcoholics Anonymous meetings, and studies for his GED. (Tr. 664-65.)

The VE classified the plaintiff's past relevant work as a painter as medium and skilled and his jobs as a greenskeeper, glue machine operator, and brake press operator as medium and unskilled. (Tr. 666.)  The ALJ asked the VE to consider what type of work the plaintiff could perform if he had a light and sedentary RFC and could not use his dominant right arm and hand (tr. 666-67), and the VE replied that the plaintiff would be able to work as an unskilled entry level security guard, as an unskilled entry level cashier, or as a dispatcher for a plumbing, heating, air conditioning, or cleaning service. (Tr. 667.)  The VE testified that if the plaintiff had to lie down during the day, he would not be able to perform any of the aforementioned jobs unless he could lie down on his lunch break or before or after work, and that if the plaintiff were limited to jobs with only simple instructions, the job of dispatcher would not be available, but the other jobs would be available. *Id.*

The plaintiff's attorney then asked the VE to consider Ms. Biankowski's FCE (tr. 312-19) and what type of work that the plaintiff could perform, and the VE replied that the plaintiff could perform all of the jobs that he mentioned even with a "non-dominant arm." (Tr. 669-70.)  The VE testified that the plaintiff would be required to lift seven to nine

pounds at the security job and up to 20 pounds at the light cashiering job, but that the dispatching job "really does not involve any lifting but would require some note taking." (Tr. 670.) Finally, the VE related that the plaintiff would be precluded from working if his pain level were constant and severe, but that, if his pain level were mild or moderate "it wouldn't significantly limit the jobs." *Id.*

### C.  Hearing testimony from April 5, 2006:The Plaintiff and a Vocational Expert

The plaintiff's second hearing was held on April 5, 2006, before ALJ James A. Sparks. (Tr. 672-88.)  The plaintiff was represented by counsel, and the plaintiff and VE Edward Smith testified. (Tr. 672.)  The plaintiff testified that he has been unable to work due to brachial plexus nerve damage in his right arm, problems with his left and right shoulders, pain in his left hip, left knee, and right side of his back, and depression. (Tr. 674-76.)  He testified that he occasionally takes Tylenol but that it does not relieve his pain, and that his level of pain is an eight out of ten before taking medication and a seven out of ten after taking medication. (Tr. 676, 678.)

The plaintiff testified that he can walk a maximum of 150 feet before he has to stop and rest, stand for five minutes at a time, sit straight in a chair for half an hour, bend over and squat "a little bit," and lift approximately one and a half pounds with both arms. (Tr. 677.)  He related that he has difficulty remembering things, concentrating, sleeping,

and breathing. (Tr. 677-78.) The plaintiff testified that he is able to dress and bathe himself, that his mother does the cooking, that he spends "90 percent" of his day in bed to ease his pain, that he does not do laundry or go shopping, and that he attends church. (Tr. 678-80.) He also related that he has pain in both arms that runs from his shoulders to his hands, and in his left knee and hip. (Tr. 680-81.)

The ALJ asked the VE to consider Dr. Fields' RFC and Dr. Kupstas' PRTF (tr. 536-61) and what type of work the plaintiff could perform, and the VE replied that he would be precluded from performing his past jobs but could perform other unskilled jobs such as an office helper, furniture rental clerk, or storage facility rental clerk. (Tr. 682-83.) The VE then related that, if the plaintiff's testimony regarding his level of pain were "given full credibility," he would be precluded from performing all types of work. (Tr. 683.)

The plaintiff's attorney asked the VE to consider Dr. Johnson's consultative examination (tr. 495-99) and what type of work the plaintiff would be able to perform, and the VE replied that he would be able to perform work at the light exertion level. (Tr. 684.) Next, the plaintiff's attorney asked the VE to consider Dr. Blevins' consultative examination (tr. 182-91) and what type of work the plaintiff would be able to perform, and again the VE answered that he would be able to perform work at the light exertion level. *Id.* The plaintiff's attorney then asked the VE to consider Dr. Wheelhouse's consultative examination (tr. 500-10) and what type of work the plaintiff would be able to perform, and

the VE replied that "the jobs that I outlined would accommodate [Dr. Wheelhouse's assigned restrictions]." (Tr. 686-87.) He related that the jobs of office helper and rental clerk would accommodate a requirement of having to alternate between sitting and standing, and that both jobs would not involve "excessive" pulling or lifting. (Tr. 687.) The VE also testified that, if the plaintiff were restricted to less than sedentary work or if he would have to lie down during the day, there would be no jobs available to him. (Tr. 685.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on October 16, 2006. (Tr. 21-26.) Based on the record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.

2. The claimant has not engaged in substantial gainful activity since October 10, 2000, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

* * *

3. The claimant has the following severe impairments: disorder of the right upper extremity with pain, breathing problems, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

* * *

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20

CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

* * *

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently. He can walk 6 hours total during an 8-hour workday, stand 6 hours total during an 8-hour workday, and can sit 6 hours during an 8-hour workday. He is limited in his ability to reach overhead with the right upper extremity to an occasional basis. He is precluded from work around dust, fumes, and gases. He can perform routine, repetitive tasks. He experiences mild to moderate pain with a mild to moderate loss of concentration. He is able to sustain concentration, persistence, and pace over extended periods for simple tasks, detailed with some difficulty at times, but still can do. The claimant is not significantly limited in his ability to understand and remember; socially interact; and adapt to routine changes in a work setting. These exertional and non-exertional limitations are commensurate with a residual functional capacity for a significant range of light work and are consistent with the findings of the State Agency designated physicians (Exhibits 23F & 24F).

* * *

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

* * *

7.      The claimant was born on December 19, 1963, and was 36 years old on the alleged disability onset date, is currently 42 years of age, both of which are defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).

8.   The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not an issue in this case due to the claimant's limited residual functional capacity (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

\* \* \*

11.  The claimant has not been under a "disability," as defined in the Social Security Act, from October 10, 2000, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 22-26).

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must

be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2008); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of

establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe his medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c),416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, he is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v.*

*Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step process. (Tr. 26.) At step one, the ALJ found that the plaintiff successfully demonstrated that he had not engaged in substantial gainful activity since October 10, 2000, the alleged onset date of disability, and that he was insured for DIB through December 31, 2006. (Tr. 21.) At step two, the ALJ found that the plaintiff's "disorder of the right upper extremity with pain," breathing problems, and anxiety were severe impairments. (Tr. 22.) At step three, the ALJ determined that the plaintiff's impairments, either singly or in any combination, did not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation 4. *Id.* At step four, the ALJ found that the plaintiff was unable to perform any past relevant work. (Tr. 25.) At step five, the ALJ concluded that the plaintiff had the RFC to perform a significant range of light work and could work as an office helper, furniture rental clerk, and store facility clerk. (Tr. 25-26.)

### C. The Plaintiff's Assertions of Error

The plaintiff contends that the ALJ did not follow the mandates of the Appeals Council's remand order, erred in determining that he did not meet Listing 1.02, and improperly assessed his treating physician's medical opinions. Docket Entry No. 18, at 4-14, 16-18, 27-31. He also argued that the ALJ erred in analyzing his subjective complaints of pain and in finding that he had the RFC to perform a reduced range of light work. *Id.* at 14-16, 18-27, 31-34.

### 1. The scope of the Court's review does not include whether the ALJ followed the mandates of the Appeals Council.

The plaintiff argues that the ALJ failed to follow and to properly address the ten directives in the Appeals Council's November 1, 2005, remand order. Docket Entry No. 18 at 4-14. In general, the Appeals Council directed the ALJ to:

1. Include a specific finding regarding the degree of limitation in each of the four functional areas to assess the plaintiff's mental impairment severity;

2. Indicate the weight given to Dr. Wood's opinions and explain why the corresponding mental limitations were not incorporated in the RFC determination;

3. Discuss how the plaintiff's pain, limitations, and treatment relating to his right upper extremity impairment were found inconsistent with the record's objective evidence;

4. Mention factors such as type, dosage, effectiveness, and side-effects of medication or other measures used to relieve symptoms;

5. Further evaluate the credibility of the plaintiff's subjective complaints and alleged limitations;

6. Express the plaintiff's RFC in specific functional terms;

7. Address or indicate the weight given to medical opinions of record indicating that the plaintiff's ability to walk, stand, and perform postural activities may be less than what is generally required for work at the light exertional level;

8. Further evaluate the plaintiff's physical and mental RFC to address existing medical opinion evidence and the February 18, 2004, FCE report by Dr. Wheelhouse;

9. As appropriate, obtain updated medical records from the plaintiff's treating and other medical sources, and if needed, obtain a consultative physical and/or mental status examination; and

10. Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base, with hypothetical questions reflecting the specific capacity/limitations established by the record as a whole.

(Tr. 376-79.) Specifically, the plaintiff contends that the ALJ failed to properly evaluate his four functional areas, Dr. Wood's medical findings, the credibility of his subjective complaints of pain, the effects of his medications, the medical opinions of consultative physicians, and Dr. Wheelhouse's FCE; failed to obtain complete consultative assessments; and failed to ask the VE hypotheticals that reflected his specific limitations. Docket Entry No. 18, at 4-14.

Sections 405(g) and 405(h) of the Social Security Act ("the Act") set forth the exclusive jurisdictional basis for judicial review under the Act. 42 U.S.C. §§ 405(g)-(h). Under section 405(g), three conditions must be satisfied to obtain judicial review: "(1) a final decision of the [Commissioner] after a hearing; (2) commencement of the civil action within sixty days after the mailing of notice of such decision, or within such additional time as the [Commissioner] may permit; [and] (3) filing of the action in appropriate district court." *Willis v. Sullivan*, 931 F.2d 390, 396 (6th Cir. 1991) (citing 42 U.S.C. § 405(g); *Weinberger v. Salfi*, 422 U.S. 749, 763-64, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)). Although the term "final decision" is not defined by the Act, "pursuant to 42 U.S.C. § 405(a), the [Commissioner] is authorized to define a 'final decision' in whatever fashion deemed necessary for the efficient and effective administration of the Act." *Willis*, 931 F.2d at 397 (quoting *Weinberger*, 422 U.S. at 766).

The Commissioner and Congress have enacted a four step process that "facilitate[s] the orderly and sympathetic administration of disputed claims" and ends with a final decision of the Commissioner that is subject to judicial review. *Willis*, 931 F.2d at 397 (quoting *Heckler v. Day*, 467 U.S. 104, 106, 104 S.Ct. 2249, 2251, 81 L.Ed.2d 88 (1984)). *See* 20 C.F.R. §§ 416.1402- 416.1483. First, a plaintiff is entitled to an initial determination of disability. 42 U.S.C. § 421(a); 20 C.F.R. § 404.1503. Secondly, if the plaintiff is dissatisfied with that determination, he may ask for a de novo reconsideration. 20 C.F.R.

§§ 404.907-404.921.  Third, if dissatisfied with the reconsidered determination, the plaintiff may request a de novo hearing before an ALJ. 42 U.S.C. § 405(b); 20 C.F.R. §§ 404.929-404.961.  Fourth, if unsatisfied with the ALJ's decision, the plaintiff may request that the Appeals Council review that decision. 20 C.F.R. §§ 404.967- 404.983.  The Appeals Council may deny the plaintiff's request for review and adopt the ALJ's decision as the final decision of the Commissioner, or the Appeals Council may grant the plaintiff's request for review and issue its own decision. 20 C.F.R. § 404.981.  In either event, the plaintiff is then able to seek judicial review of the Commissioner's decision by filing an action in federal district court within sixty days of receiving notice of the Appeal's Council's action. 20 C.F.R. §§ 404.981, 422.210.  In sum, under the regulations, a plaintiff obtains a judicially reviewable "final decision" of the Commissioner when either the Appeals Council denies the plaintiff's request for review and adopts the ALJ's decision or renders its own decision. *Id.*

In this case, the Court is only concerned with the Appeals Council review at step four of this process.  The Regulations provide that "'the administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order.'" *Brown v. Comm'r of Soc. Sec.*, 2009 WL 465708, at *6 (W.D. Mich. Feb. 24, 2009) (quoting C.F.R. § 416.1477(b)).  It is also "well established" that an Appeals Council's remand order is not a final decision of the

Commissioner, *King v. Comm'r of Soc. Sec.*, 2010 WL 3210938, at *3 (W.D. Mich. June 29, 2010) (citing *Weeks v. Soc. Sec.* Admin., 230 F.3d 6, 7-8 (1st Cir. 2000) and *Duda v. Sec'y of Health & Human Servs.*, 834 F.2d 554, 555 (6th Cir. 1987)), and that "[w]hether an ALJ complies with an Appeals Council order of remand is an internal agency matter which arises prior to the issuance of the agency's final decision." *Brown*, 2009 WL 465708, at *6.

Plainly stated, this Court's scope of review "is limited to an analysis of the ALJ's decision and not a review of the ALJ's compliance with the Appeals Council's Order of Remand." *Peterson v. Comm'r of Soc. Sec.*, 2010 WL 420000, at *7 (E.D. Mich. Jan. 29, 2010) (citing *Riddle v. Astrue*, 2009 WL 804056, at *19 (M.D.Tenn. Mar. 25, 2009)). *See Dyer v. Sec'y of Health & Human Servs.*, 889 F.2d 682, 684 (6th Cir.1989); *Dishman v. Astrue*, 2009 WL 2823653, at *11 (E.D.Tenn. Aug. 27, 2009); *Brown*, 2009 WL 465708 at *6 ("By failing to remand the matter a second time, it appears the Appeals Council considered the ALJ's [decision] to be in compliance with the Council's previous order of remand [and ] Section 405(g) does not provide this court with authority to review intermediate agency decisions that occur during the administrative review process."). Therefore, since an Appeals Council's order to remand is a function of inter-agency review and does not constitute a "final decision," this Court is precluded from determining whether the ALJ fully complied with the mandates set forth in the Appeals Council's remand order.

## 2. The ALJ correctly determined that the plaintiff did not meet the requirements of Listing 1.02.

The plaintiff argues that injuries to his left knee and both upper extremities meet or equal Listing 1.02. Docket Entry No. 18 at 16-18. Specifically, the plaintiff contends that his left knee injury "results in his inability to ambulate effectively" and that his shoulder injuries "result[] in his inability to perform fine and gross movements." *Id.* at 18. Further, the plaintiff asserts that his right shoulder injury is more severe than his left shoulder injury because he is right hand dominant and has reduced grip strength in his right hand and is not able to raise his right arm above his shoulder. *Id.*

"'[T]he burden of proof lies with the [plaintiff] at steps one through four of the [sequential disability benefits analysis],' including proving presumptive disability by meeting or exceeding a Medical Listing at step three." *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D.Ky. Aug. 15, 2008) (quoting *Her*, 203 F.3d at 391). Thus, the plaintiff "'bears the burden of proof at Step Three to demonstrate that he has or equals an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.'"[42] *Little*, 2008 WL 3849937, at *4 (quoting

---

[42] There are three ways in which a plaintiff can show that his combination of impairments is equivalent to a listed impairment:

    (1)(i) If you have an impairment that is described in the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter, but--

    (A) You do not exhibit one or more of the findings specified in the particular listing, or

    (B) You exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing,

    (ii) We will find that your impairment is medically equivalent to that

*Arnold v. Comm'r of Soc. Sec.*, 238 F.3d 419 (table), 2000 WL 1909386, at *2 (6th Cir. Dec. 27,

2000)).  The plaintiff's impairment must meet all of the listing's specified medical criteria

and "[a]n impairment that meets only some of those criteria, no matter how severely, does

not qualify." *Sullivan*, 493 U.S. at 530-532 (1990).  If the plaintiff does demonstrate that his

impairment meets or equals a listed impairment, then the ALJ "'must find the [plaintiff]

disabled.'" *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health & Human Servs.*,

835 F.2d 139, 140 (6th Cir.1987)).

Listing 1.02 provides that disability caused by major joint dysfunction is

---

listing if you have other findings related to your impairment that are at least
of equal medical significance to the required criteria.

(2) If you have an impairment(s) that is not described in the Listing of
Impairments in appendix 1 of subpart P of part 404 of this chapter, we will
compare your findings with those for closely analogous listed impairments.
If the findings related to your impairment(s) are at least of equal medical
significance to those of a listed impairment, we will find that your
impairment(s) is medically equivalent to the analogous listing.

(3) If you have a combination of impairments, no one of which meets
a listing described in the Listing of Impairments in appendix 1 of subpart P
of part 404 of this chapter (see § 416.925(c)(3)), we will compare your findings
with those for closely analogous listed impairments. If the findings related
to your impairments are at least of equal medical significance to those of a
listed impairment, we will find that your combination of impairments is
medically equivalent to that listing.

20 C.F.R. §§ 416.926(b), 404.1526(b).  *See also Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S.Ct.
885, 107 L.Ed.2d 967(1990) ("For a claimant to qualify for benefits by showing that his
unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment,
he must present medical findings equal in severity to all the criteria for the one most
similar listed impairment.")

[c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively,[43] as defined in 1.00B2b; or

---

[43] The Regulations define the "[i]nability to ambulate effectively" as: extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

*To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(1)-(2) (internal citations omitted).

B. Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively,[44] as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.

To meet Listing 1.02A, the plaintiff must prove that his left knee injury prevents him from ambulating effectively, as defined in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02A.  *See supra* n.43.  An individual is unable to ambulate effectively if, when walking, he requires assistance from a companion or a hand-held assistive device such as a walker, crutches, or cane. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b.  Although the plaintiff  had two arthroscopic surgeries on his left knee in October of 2000, and November of 2004, respectively, (tr. 229, 579), the record shows that he met all of his goals at discharge from physical therapy (tr. 586), and he testified that he

---

[44] The Regulations define the "[i]nability to perform fine and gross movements effectively" as:

> an extreme loss of function of both upper extremities; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2c.

could drive a boat and automobile, attend GED classes and church, and go to the grocery store with his father. (Tr. 531-33, 664-65, 678-79.)  The record does not indicate that the plaintiff used an assistive device or required the help of another individual to participate in the listed daily activities or to ambulate, and thus, he does not meet Listing 1.02A.

To meet Listing 1.02B, the plaintiff must prove that his upper extremity injuries to both shoulders resulted in an extreme loss of function, preventing him from effectively performing fine and gross movements as defined in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2c.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02A.  *See supra* n.44.  The record shows that the plaintiff's right shoulder has undergone a significant loss of function, beginning with a November 8, 2000, MRI that indicated  that he had nerve damage to his right arm. (Tr. 218.)  From that point forward, the plaintiff was repeatedly diagnosed with brachial plexopathy in his right shoulder (tr. 182-83, 196, 198-203, 205-06, 208, 218, 235, 508) and scapula trigger pain (tr. 302-03), and he underwent physical therapy (234, 520-24) and arthroscopic surgery. (Tr. 130, 244.)  When his pain did not subside after physical therapy and arthroscopic surgery, he received steroid injections for nearly four years (tr. 196-201, 302, 518-19, 521, 523, 615, 617-18, 622, 624) and was encouraged to avoid lifting his right arm above shoulder level. (Tr. 237-38, 497-98, 539.)

The record also shows that in February of 2003, Dr. Sherwood noted that the plaintiff had decreased levels of abduction and forward elevation in his right shoulder (tr. 193) and

that in January of 2004, Dr. Wheelhouse found weakness in his right shoulder and upper extremity, decreased levels of strength in his right biceps, triceps, and hand, and restrictions with his ability to reach, lift, and pull. (Tr. 509.)  The record evidence clearly indicates that the plaintiff's right shoulder impairment significantly compromised his ability to perform fine and gross movements effectively with his right upper extremity.

Although there is an abundance of evidence in the record indicating that the plaintiff has a significant right upper extremity impairment that affects his ability to perform fine and gross movements, the record evidence does not support a similar finding for his left upper extremity impairment.  Dr. Sherwood first diagnosed the plaintiff with left shoulder tendinitis in September of 2004 (tr. 564), and the plaintiff underwent physical therapy for several weeks. (Tr. 562-73.)  When he was discharged from physical therapy, it was noted that the plaintiff "made nice progress with [the] strengthening of [his] left shoulder." (Tr. 562.)

From February through March of 2005, the plaintiff received several steroid injections in his left shoulder (tr. 612, 613, 614), but those injections did not relieve his shoulder pain and in June of 2005, Dr. Dalton performed arthroscopic shoulder surgery and biceps tenodesis on his left upper extremity. (Tr. 595-97.)  Dr. Dalton examined the plaintiff on three occasions after his surgery and noted that his range of motion had improved, that his pain level had decreased, and that he had strong grip strength. (Tr. 606.)  The plaintiff

also related that he was "improving dramatically on a day-to-day basis." *Id.* There is no record evidence indicating that the plaintiff suffered from an extreme loss of function in his left upper extremity, and the plaintiff testified that, although he has difficulty putting on a belt, he is able to drive a boat or automobile, make a sandwich, use a computer, and dress and bathe himself. (Tr. 678-79.)

The plaintiff has had arthroscopic surgery on both his right and left upper extremities, but the record evidence establishes that only the plaintiff's right upper extremity displayed a significant loss of functioning while his left upper extremity exhibited post-surgical improvement. Since impairments to only one of the plaintiff's upper extremities, and not both of his upper extremities, significantly affected his ability "to perform fine and gross movements effectively," he does not meet Listing 1.02B.

### 3. The ALJ properly assessed the medical opinions of the plaintiff's treating physician.

The plaintiff alleges that the ALJ erred in failing to assign controlling weight to Dr. Sherwood's medical opinion (tr. 300), and to Dr. Wheelhouse's medical exam (tr. 500-10) and Ms. Biankowski's FCE (tr. 312) since both "were done at the behest of Dr. Sherwood." Docket Entry No. 18, at 27. From 2000 to 2005, Dr. Sherwood examined the plaintiff on multiple occasions (tr. 193, 198-203, 206-07, 279-80, 285, 293 301-03, 495, 529,

520-24, 531, 615-26) and, given that regularity, he is classified as a treating source under 20 C.F.R. § 404.1502.[45]

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) . Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R.*

---

[45] A treating source, defined by 20 C.F.R. § 404.1502, is
your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

*404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc.

Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original).  The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination;
> (2) the nature and extent of the treatment relationship; (3) the supportability
> of the opinion with respect to relevant evidence such as medical signs and
> laboratory findings; (4) the consistency of the opinion with the record as a
> whole; (5) the specialization of the physician rendering the opinion; and
> (6) any other factor raised by the applicant.

*McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 30 (6th Cir. Aug. 19, 2009) (citing *Wilson*,

378 F.3d at 544); *Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting

20 C.F.R. § 404.1527(d)(2)-(6)).  The ALJ must also provide "good reasons" for the resulting

weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20

C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2

(6th Cir. Mar. 8, 2010).  The "good reasons" must be "sufficiently specific to make clear to

any subsequent reviewers the weight the adjudicator gave to the treating source's medical

opinion and the reasons for that weight," Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), and so that the plaintiff understands the

disposition of his case. *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.

1999).

The Sixth Circuit has plainly held that a reversal of a denial of benefits and remand

are warranted, even if the record may contain substantial evidence that supports the

Commissioner's decision, when the ALJ fails to provide good reasons for discounting the

medical opinion of the plaintiff's treating physician. *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. Apr. 28, 2010) (citing *Wilson*, 378 F.3d at 544). The failure to follow "the procedural requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Friend*, 375 Fed. Appx. at 551 (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir.2007)). *See also Wilson*, 378 F.3d at 546 ("A court cannot excuse the denial of a mandatory procedural protection simply because . . . there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely.").

However, the Sixth Circuit has also determined that there are circumstances when noncompliance with the good reasons requirement is "harmless error," if: "'(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;' (2) 'if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;' or (3) 'where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation.'" *Friend*, 375 Fed. Appx. at 551 (quoting *Wilson*, 378 F.3d at 547). Should the third situation occur, "the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency

with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments." *Friend*, 375 Fed. Appx. at 551 (citing *Nelson v. Comm'r of Soc. Sec.*, 195 Fed.Appx. 462, 470-72 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 Fed.Appx. 456, 464 (6th Cir. 2006)). The function of the good reason requirement is to provide clarity and transparency to the reviewing body and, more importantly, to the plaintiff, but it is not a "procrustean bed" that requires "an arbitrary conformity at all times." *Friend*, 375 Fed. Appx. at 551.

In this case, the ALJ noted, *in toto*, that

[o]n June 27, 2003, general practitioner, Dr. Sherwood, related that the claimant "does have disability in the right upper extremity." The undersigned notes that Dr. Sherwood is not familiar with the definition of "disability" as it is in the Social Security Act and Regulations, and furthermore, a "disability of the right upper extremity" does not indicate a disability from performing all types of work functions and activities.

(Tr. 24.)

The plaintiff correctly argues that the ALJ did not assign a specific amount of weight to Dr. Sherwood's medical opinions and failed to comply with the good reasons requirement (Docket Entry No. 18, at 27-31), but his noncompliance is harmless error since his final determination was consistent with Dr. Sherwood's medical findings. The majority of Dr. Sherwood's examinations focused on the plaintiff's right upper extremity (tr. 193, 198-203, 206-07, 300-03, 520-24, 624-26) and he repeatedly diagnosed the plaintiff with right arm brachial plexopathy (tr. 198-203, 206-07), right scapula trigger pain (tr. 198-201, 302-03,

520-24, 624-26), and a decreased range of motion in his right upper extremity. (Tr. 193, 300-01) The ALJ determined that the plaintiff's "disorder of the right upper extremity with pain" was "severe" and that he had a "history of receiving medical treatment" for his right shoulder. (Tr. 22.) The ALJ's determination was congruous with Dr. Sherwood's diagnoses and encompassed the findings in his treatment notes, thus satisfying the second prong of *Wilson's* harmless error provision.

Additionally, the ALJ properly rejected Dr. Sherwood's conclusion that the plaintiff suffered from a disabling impairment to his right upper extremity. (Tr. 22.) In arguing that the ALJ erred, the plaintiff specifically points to Dr. Sherwood's June 27, 2007, medical examination note in which he concluded that the plaintiff had a "disability in the right upper extremity," evidenced by a decreased range of motion, persistent pain, weakness, and atrophy of his shoulder muscles, and "proven" by x-ray (MRI) and EMG studies. Docket Entry No. 18, at 27; tr. 300-01. The regulations clearly indicate that ability to work determinations are reserved for the Commissioner:

> We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

20 C.F.R. § 404.1527(e)(1). *See Gant v. Comm'r of Soc. Sec.*, 372 Fed.Appx. 582, 584-85 (6th Cir. 2010) ("Conclusory medical opinions are properly discounted as only the

Commissioner can make the ultimate determination of disability."); *Brock*, 368 Fed.Appx.at 625 (citing 20 C.F.R. § 404.1527(e)(3)) ("[N]o 'special significance' will be given to opinions of disability, even those made by the treating physician."). Thus, the ALJ did not err in discounting Dr. Sherwood's conclusion that the plaintiff was disabled because of his right upper extremity since that is a determination reserved for the Commissioner. *Id.*

Finally, the plaintiff appears to suggest that the ALJ failed to give controlling weight to Dr. Wheelhouse's medical exam (tr. 500-10) and Ms. Biankowski's FCE (tr. 312), since both "were done at the behest of Dr. Sherwood." Docket Entry No. 18, at 27. Such an argument is flawed because, as the government points out, he attempts "to elevate" Dr. Wheelhouse and Ms. Biankowski to the level of treating physicians. Docket Entry No. 24, at 20. Dr. Wheelhouse is not classified as a treating physician because he examined the plaintiff on only one occasion. (Tr. 500-10.) *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (a doctor who examined a plaintiff, completed a medical report, prescribed and refilled medication, and denied medication when the plaintiff returned seeking more, did not demonstrate an ongoing treatment relationship as set forth in the regulation); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502). Instead, Dr. Wheelhouse should

be classified as a nontreating physician, i.e., "a physician . . . who has examined [the plaintiff] but who does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502. Additionally, Ms. Biankowski is a physical therapist and not a physician. Since neither Dr. Wheelhouse or Ms. Biankowski are treating physicians, the ALJ correctly determined that their medical evaluations should not be assigned controlling weight.

### 4. The ALJ did not err in analyzing the plaintiff's subjective complaints of pain.[46]

The plaintiff alleges that the ALJ erred in evaluating the credibility of his subjective complaints by finding him not fully credible. Docket Entry No. 18, at 18-27, 31-33. The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 23.) The ALJ noted that, after the plaintiff had arthroscopic surgery on his left shoulder, his range of motion improved and he reported having decreased levels of pain, that taking Avinza resulted in "almost complete resolution of his discomfort," that

---

[46] In this section, the Court combined and addressed two issues raised by the plaintiff, specifically that the ALJ did not properly "consider the combined effect of the plaintiff's multiple impairments, including pain" and that the ALJ erred in concluding that the plaintiff's testimony was not credible, since both issues overlap. *See* Docket Entry No. 18, at 18-27, 31-33.

Ibuprofen provided additional pain relief, and that he was "improving dramatically on a day to day basis." *Id.* Next, the ALJ relied on Dr. Dalton's diagnosis of the plaintiff's knee and hip symptoms as "mild-to-moderate in magnitude," that the objective record evidence does not indicate that his left hip or knee conditions had worsened with time (*id.*), and that, although his pain was an eight out of ten when not taking prescription strength medication, because he had no health insurance, and a seven out of ten when taking prescription strength medication, he only occasionally took Tylenol and did not use "any other pain relief modalities." (Tr. 24-25.)

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision on credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the [plaintiff]'s complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information

provided by treating physicians, and other relevant evidence. *Id.* at 5. The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the Social Security Administration ("SSA") and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. See 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[47] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

---

[47] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n. 2.

There is objective evidence of underlying physical medical conditions: the plaintiff had arthroscopic surgery on his right and left shoulders and left knee (tr. 229, 234, 579, 595-97), and was diagnosed with right shoulder brachial plexopathy (tr. 182-83, 196, 198-203, 205-06, 208, 218, 235, 508) and left shoulder tendinitis. (Tr. 564.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[48]

---

[48] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

In making his credibility determination, the ALJ relied on medical records from treating and examining sources, prescribed medication, and the plaintiff's own testimony regarding his activities of daily living. (Tr. 23-25.) First, Dr. Dalton, a treating orthopaedist, after performing arthroscopic surgery on the plaintiff's left knee, related that the plaintiff's knee and hip symptoms were "mild to moderate" (tr.610), and after performing arthroscopic surgery on his left shoulder and biceps noted that his shoulder movement had improved and pain had decreased. (Tr. 606-07.) Multiple consultative physicians also evaluated the plaintiff's physical limitations and found that he could lift about twenty pounds occasionally and ten pounds frequently; that he could sit for at least five hours and stand/walk for at least six hours in an eight hour day; and that his ability to reach overhead or use his right upper extremity would be significantly limited. (Tr. 175, 187, 225, 497-98, 510, 512-13, 537.)

In addition, the plaintiff testified at his April 5, 2006, hearing that he occasionally took Tylenol, and not prescribed pain medication, for his hip, knee, shoulder, arm, and back pain because he did not have insurance coverage. (Tr. 676.) However, the credibility of the plaintiff's explanation for taking only a nonprescription pain reliever is undercut by his earlier testimony, when he acknowledged that he was taking Fluoxetine and Prozac for depression and Diovan for high blood pressure. *Id.* The Court is not questioning the plaintiff's claim that he did not have insurance. However, the plaintiff's credibility about

the severity of his pain and his subjective complaints is called into question if he takes prescription medicine for depression and high blood pressure but not prescription pain medication. *Id.* Finally, the plaintiff testified that he could drive a boat and an automobile, attend GED classes and church, and go to the grocery store with his father. (Tr. 531-33, 664-65, 678-79.)

In sum, the medical reports of the plaintiff's treating and examining sources, prescribed medication, and the plaintiff's own testimony regarding his activities of daily living demonstrate that his physical impairments cause him a certain amount of pain, but that same record medical evidence does not support the plaintiff's subjective complaints that his pain is disabling.

### 5. The ALJ properly evaluated the plaintiffs physical RFC in determining that he could perform light work.

The plaintiff objects to the ALJ's assessment that he has the RFC to perform light work with a required sit/stand option. Docket Entry No. 18 at 14-16. The ALJ determined that the plaintiff retained the RFC to lift/carry twenty pounds occasionally and ten pounds frequently; to sit, stand, and walk for six hours during an eight-hour workday; and to perform routine and repetitive tasks but that his ability to reach overhead with his right upper extremity is limited and that he is not able to work around dust, fumes, and gases.

(Tr. 22.)  The ALJ concluded that the plaintiff's RFC enabled him to perform a significant range of light work. *Id.*

An individual's RFC is "a medical assessment of what that individual can do in a work setting in spite of functional limitations and environmental restrictions imposed by all of his medically determinable impairments." *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at *8 (W.D. Mich. Sept. 29, 2009) (citing 20 C.F.R. § 404.1545).  In assessing an individual's RFC, the ALJ must consider the individual's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4).  Since the plaintiff alleges disability due to a physical impairment, the ALJ must consider his ability "to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching) [and how those functions] may reduce [his] ability to do past work and other work." 20 C.F.R. § 404.1545(b).

The plaintiff argues that he "is not capable of performing light work, a reduced range of light work as the ALJ found, sedentary work, or any work on a sustained basis[;]" that his testimony from the April 5, 2006, hearing is credible and thus, according to the VE, is not able to work; and that the ALJ incorrectly characterized, in his RFC determination,

the one hour standing/walking limitation that Dr. Wheelhouse assigned to him as "normal breaks." Docket Entry No. 18, at 15-16.

First, in evaluating the plaintiff's RFC, the ALJ noted that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (Tr. 24.) He specifically relied on the medical opinions of Dr. Dalton, a treating orthopaedist, consultative DDS physicians Dr. Fletcher and Dr. Fields, and the plaintiff's own description of his daily activities. (Tr. 22-24.) Next, as discussed *supra*, the ALJ correctly determined that the plaintiff's testimony regarding his subjective complaints of pain was not fully credible. (Tr. 23)

Finally, the ALJ's failure to specifically include a sit/stand option from Dr. Wheelhouse's evaluation in the plaintiff's RFC determination is not reversible error. The VE testified that the jobs that he found that the plaintiff could perform, as a store facility clerk, furniture rental clerk, and office helper (tr. 683) "would accommodate . . . the one hour standing and walking [limitation] . . . [and] would allow one to sit or stand essentially at will" (tr. 687), and the ALJ noted this testimony in his findings. (Tr. 26.) The ALJ did not need to include a specific sit/stand requirement in the plaintiff's RFC finding since each of the jobs assigned to the plaintiff would allow him to sit/stand "at will."

(Tr. 687.)  At worst, the ALJ's failure to specifically address the plaintiff's sit/stand limitation is harmless error since remanding this case would amount to nothing more than an "'idle and useless formality.'" *Rabbers*, 582 F.3d at 654 (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), and citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001)).

Given the ALJ's detailed analysis of the plaintiff's RFC (tr. 22-25), it is clear that he carefully considered all the record evidence and properly concluded that the plaintiff retained the ability to perform substantial gainful activity and more specifically, "a significant range of light work." (Tr. 22.)

Although he did not address the issue in his memorandum in support of his motion, in his response to the defendant's motion the plaintiff raises an issue of whether the jobs that the ALJ found the plaintiff could perform existed in significant numbers.  Docket Entry No. 25.  The plaintiff contends that a total of 5,300 jobs for the State of Tennessee and 210,300 for the national economy do not constitute a significant number of jobs.  However, the plaintiff cites no authority for her proposition and recent Sixth Circuit decisions have affirmed the denial of benefits when there were far fewer jobs available in the national economy. *McGrew v. Comm'r of Soc. Sec.*, 343 Fed Appx. 26, 29, 2009 WL 2514081 (6th Cir. Aug. 19, 2009) (47,000 and 20,300 jobs).  *See Nejat v. Comm'r of Soc. Sec.*, 359 Fed. Appx. 574, 579, 2009 WL 4981686 (6th Cir. Dec. 27, 2009) (48,000 jobs).

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 17) be DENIED, that the defendant's motion for the judgement on the administrative record (Docket Entry No. 21) be GRANTED, and that the Commissioner's decision be affirmed, and that this action be DISMISSED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


JULIET GRIFFIN
United States Magistrate Judge